**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UBERETHER, INC.,<br><br>                          Plaintiff,<br><br>        v.<br><br>ANITIAN, INC.,<br><br>                        Defendant. | C.A. No. 22-88 RGA<br><br>**DEMAND FOR JURY TRIAL**<br><br>REDACTED - PUBLIC VERSION<br>FILED MARCH 23, 2022 |

**FIRST AMENDED COMPLAINT**

Plaintiff UberEther, Inc. ("UberEther" or "Plaintiff"), by and through its undersigned attorneys, hereby states and alleges as follows:

**PRELIMINARY STATEMENT**

1.      Defendant Anitian, Inc. ("Defendant" or "Anitian") led UberEther down a primrose path promising compliant and timely-delivered cloud computing solutions capable of ensuring UberEther would be "audit ready" and expressly prepared to provide services for an eager Department of Defense ("DOD") customer.  Despite Anitian's assurances and promises, cemented through multiple contracts and reaffirmed through months of meetings, Anitian ultimately had neither the experience it represented possessing nor the necessary resources to meet the contractually obligated requirements in the agreed upon timeframe.  As a result of UberEther's reliance on Anitian's fallacious experience, broken promises, and amateurish performance, UberEther (1) failed the necessary third-party audit Anitian was hired to facilitate, (2) is presently unable to sell certain services to the DOD or any Federal Government Customer, and (3) will not be able to re-schedule a new third-party audit until April 2022, nine months

behind schedule. Anitian's actions constitute material and repeated breaches of the parties' agreements and directly caused UberEther to sustain significant financial, reputational, and professional damages.

## PARTIES

2.      Plaintiff UberEther is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Sterling, Virginia.

     a.      UberEther is an information technology company that provides and integrates technical solutions that improve information security, identity management, and access management for its clients, customers, and partners.

     b.      UberEther sells and develops solutions for commercial customers as well as federal, state and local government customers, such as the United States Department of Defense.

3.      Defendant Anitian is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 8625 SW Cascade Ave., Suite 500, Beaverton, Oregon 97008.

     a.      Anitian advertises that it provides pre-engineered cloud solutions and platforms, in pertinent part, to facilitate and accelerate Federal Risk and Authorization Management Program ("FedRAMP") audit-readiness and compliance.

## JURISDICTION AND VENUE

4.      UberEther and Anitian are both corporations with Anitian organized and existing under the laws of the State of Delaware and UberEther organized and existing under the laws of the Commonwealth of Virginia.

ME1 39921272v.1

5.      This court has diversity jurisdiction under 28 U.S.C. § 1332, because the matter in controversy exceeds the value of $75,000, and this is a dispute between citizens of different states.

6.      The Master Services Agreement ("MSA") signed by the parties on March 31, 2021, contains a valid choice of venue clause designating the state and federal courts located in New Castle County, Delaware as the jurisdiction and this Court as the appropriate forum for dispute resolution related to the MSA.

## FACTUAL BACKGROUND

7.      UberEther is the creator and architect of the UberEther Cloud Managed Service ("CMS"), a cloud service offering known as the "IAM Advantage."

8.      UberEther has created IAM Advantage to assist, in pertinent part, DOD departments and federal government agencies to address and help alleviate their respective identity and access management concerns.

9.      DOD and other governmental entities have expressed interest in acquiring UberEther's IAM Advantage solution.

10.     In order to sell certain cloud service offerings to the federal government, UberEther must first receive an authority to operate by the federal government and/or the individual agencies that may have an interest in purchasing the solution(s).

## FedRAMP and the DOD SRG

11.     FedRAMP is a government-wide program that promotes the adoption of secure cloud services across the federal government by providing a standardized approach to security assessment, authorization, and continuous monitoring for cloud products and services.

ME1 39921272v.1

12.     FedRAMP is mandatory for all executive agency cloud deployments and service models at the Low, Moderate, and High risk impact levels.  The impact levels are based across three security objectives: confidentiality, integrity, and availability following the Federal Information Processing Standard ("FIPS") 199 standards.

    a. The FedRAMP **Moderate** Impact Level reflects controls necessary to ensure the confidentiality, integrity, and availability of data that, if disclosed or disrupted, would have a **serious** adverse effect on organizational operations, organizational assets, or individuals.

    b. The FedRAMP **High** Impact Level reflects controls necessary to ensure the confidentiality, integrity, and availability of data that, if disclosed or disrupted, would have a **serious or catastrophic** adverse effect on organizational operations, organizational assets, or individuals.

13.     Cloud service providers ("CSPs") pursuing a FedRAMP authorization must have their offering assessed by an independent third-party assessment organizations ("3PAO").

14.     Once engaged, 3PAOs are responsible for conducting the security assessment and developing a Readiness Assessment Report ("RAR").

15.     The FedRAMP RAR is a template document completed by the 3PAO that contains summary information regarding a CSP's ability to meet the FedRAMP requirements, based on the 3PAO's active validation of that CSP's security capabilities by way of observations, evidence reviews, personnel interviews, and demonstrated capabilities of security implementations.  This RAR can be valid for up to one calendar year after designation from the FedRAMP Project Management Office.

16.     DOD cloud security requirements are significantly different from the FedRAMP Moderate or High baselines.   These requirements are promulgated through guidance and implementing directives from the DOD, which are codified in the Cloud Computing Security Requirements Guide ("DOD SRG").

17.     The DOD SRG addresses specific defense and intelligence requirements around cloud offerings and provides a standardized assessment and authorization process for CSPs to gain a DOD provisional authorization, which is needed to sell to DOD customers.

18.     The DOD SRG addresses cloud security assessments by Impact Level that also map to the sensitivity level of the information processed.

19.     The DOD SRG identifies four DOD Impact Levels (IL2, IL4, IL5, & IL6) which are the combination of (a) the sensitivity of the information to be stored and/or processed in the cloud; and (b) the potential impact of an event that results in the loss of confidentiality, integrity, or availability of that information.

20.     DOD SRG IL5 requires that a CSP meet the following criteria:

    a.   The information security requirements accommodate DOD higher sensitivity controlled unclassified information, mission-critical information, and national security systems information.

    b.   The use of FedRAMP v2 High Security controls, *plus* CUI-specific tailored controls, *plus* controls for national security systems information, *plus* controls for personal identifiable information.

    c.   That all data is held in the U.S., U.S.-outlying areas, or on DOD premises.

    d.   For off-premises connectivity through the non-classified internet protocol router network (NIPRNET) via a cloud access point.

21.     To obtain a provisional authorization ("PA") to operate for the DOD SRG IL5 environment, a CSP's cloud service offering must be fully assessed by (i) a FedRAMP-approved 3PAO and the Defense Information Systems Agency ("DISA") Cloud Security Control Assessor ("SCA") and (ii) validated against both the FedRAMP Moderate/High Baseline and DOD SRG IL5 requirements.

22.     The security controls and requirements necessary to operate in the DOD SRG IL5 exceed those required to meet the FedRAMP Moderate and High baselines.

23.     Thereafter, the CSP and the 3PAO must submit its assessment documentation, including the RAR, to the DISA Cloud SCA for review and validation before the CSP is granted a DOD PA.

24.     A CSP cannot move forward in its ongoing effort to receive a PA to operate if it fails its RAR.

**Anitian Services**

25.     Anitian knows that FedRAMP is a complex and resource-consuming process.

26.     Anitian has stated that "FedRAMP is complex. It demands hundreds of security controls. Implementing FedRAMP manually can consume years of work, and cost millions of dollars."

27.     Anitian purports to provide "the only proven and pre-built" Compliance Automation Platform for FedRAMP "designed to dramatically accelerate FedRAMP Authorization process – while saving you time and money."

28.     Anitian markets itself to potential customers as delivering

> "the fastest path to application security and compliance in the cloud. Anitian's Compliance Automation Platform and SecureCloud DevSecOps Platform help high-growth companies get their SaaS applications to the

6

cloud and market quickly, so they can unlock revenue in weeks, not months or years. Our automated cloud application security platforms deliver a full suite of security controls – both pre-engineered and pre-configured to meet rigorous security standards such as FedRAMP, CMMC, DoD SRG, and PCI. Anitian's pre-built environment and platforms use the full power and scale of the cloud to accelerate time-to-production, time-to-market, and time-to-revenue so you can start secure, start compliant, and stay ahead."

*See* https://www.anitian.com/anitian-named-a-vendor-in-gartner-hype-cycle-for-agile-and-devops/.

29.     On its website and in its press releases, Anitian has promoted itself as "the leading cloud security and compliance automation provider" with a "secure and compliant" designed "pre-engineered, cloud-based Compliance Automation Platform . . . allowing business and DevOps teams to get their applications to market more securely and up to 80% faster than they've ever been able to do it before."   *See* https://www.anitian.com/press-release-anitian-included-in-gartners-market-guide-for-compliance-automation-tools-in-devops/.

30.     Anitian continues to promote itself as an award-winning information security provider, and claims that it was named as a "top cybersecurity company in seven categories, including Publisher's Choice Security Company of the Year, Editor's Choice in Cloud Security, and Hot Company in Cloud Security Automation."

31.     In relation to servicing the public sector, Anitian makes the following claims and promises on its website:

   a.    "Anitian has automated government compliance to cut costs, save time, and provide a level of assurance and trust that hitherto was impossible."

   b.   "In an hour, Anitian can deploy an entire cloud architecture that meets (or exceeds) compliance requirements for frameworks such as FedRAMP, DoD SRG IL2/4/5, DFARS, CJIS, and more."

c. "Our Compliance Automation platform automates everything, to remove guess work or human error."

d. "[W]hether you deploy one or one hundred Compliance Automation environments, each one of them is fully autonomous, fully automated, and identical in configuration."

e. "Anitian's 24×7 Security Operations team provides round-the-clock monitoring…"

f. "The fastest path to FedRAMP compliance."

g. "Speed up your FedRAMP audit-readiness and timeline at enterprise scale."

h. Recognizes the differences between "Moderate" and "High" controls, templates, and platforms.

i. "Everything you need to achieve FedRAMP audit-readiness and maintain your FedRAMP ATO."

j. "Documentation. Get access to Document and Template Stacks of all Security Authorization Package deliverables to help guide you through the entire FedRAMP Authorization process."

k. "FedRAMP Audit-Ready. Take the guesswork out of compliance. SecureCloud for Compliance Automation is pre-configured and pre-engineered for compliance. Access rights, password policies, security controls, and more are all done for you."

l. "Compliant Environment. As a cloud compliant architecture deployed on AWS and Azure, our automation configures all controls to meet 3PAO requirements, ensure data integrity and security, and help you retain control."

8

m. "A proven, accelerated path to FedRAMP audit-readiness and compliance."

n. "Accelerate your FedRAMP journey with the fastest, easiest, and most reliable path to FedRAMP audit-readiness and compliance. Our team works with you every step of the way to onboard your applications, fill out policy documents, and get you FedRAMP audit-ready."

o. "1 Day Cloud Security Environment. Stand up application on platform, verify security controls"

p. "59 days Configuration and Compliance. Configure and document compliance with libraries, templates, and automated tools"

q. "Only 3 full-time employees for 60 days."

r. "FedRAMP High Audit Ready: 180 days."

32.     Prior to May 31, 2021, Anitian never attempted to make a customer audit-ready in the DOD SRG IL5 environment.

33.     Anitian never made any of its customers audit-ready in the DOD SRG IL5 environment.

34.     Prior to May 31, 2021, Anitian did not possess the DOD-specific RAR templates necessary to complete documentation for the DOD SRG IL5 environment.

35.     Prior to May 31, 2021, Anitian's Vision platform had not been tested or validated for FedRAMP High or DOD SRG IL5 templates necessary to complete documentation for submission.

### Inducement into and Execution of the Agreements

36.     Upon information and belief, it is Anitian's practice to routinely record audio and/or video for meetings with UberEther associated with contract or performance-related

9

efforts.  Upon information and belief, Anitian is in possession of transcribed video and/or audio recordings with UberEther wherein the MSA, Moderate Proposal, High Proposal, contract performance, or contract status was discussed.

37.     On or around November 7, 2019, UberEther met with Katherine Burgess, Anitian's Director for Customer Success, for an initial presentation on the Anitian Automation Platform.  The presentation represented that the platform only required 60 days in which to make UberEther audit ready.  The presentation also represented that it would take Anitian 48 minutes to install everything on their part, after which UberEther could start deploying applications.  The presentation represented Anitian's platform as "accelerated, automated, autonomous, and accommodating" and as a "tapestry of automations."

38.     On or around October 18, 2020, Bill Aubin, Director of Strategic Programs at Anitian, provided UberEther with the Anitian SecOps Responsibility Matrix.   The matrix represented that Anitian would be responsible for all services pertaining to the Compliance Automation Environment ("CAE") and responsible for nearly all of the services pertaining to the Application Environment with some collaboration from UberEther.

39.     On or around November 2, 2020, Aubin also provided UberEther with a Preliminary Solution Report.  The report represented that an audit-ready environment could be expected within 60 to 90 days.  It included a sample "actual customer timeline where Anitian delivered audit-readiness in 58 days."   The report further represented Anitian's approach to FedRAMP as "all about speed. [Anitian] eliminate[s] the guess work with a proven, pre-engineered, pre-configured, audit-ready platform, backed with a team of compliance, security, and cloud experts.  Anitian's approach encompasses three phases, as part of a holistic, end-to-

end solution."   The report represented that Anitian provided its customers with "an army of experts deployed to your project 24/7."

40.      On or around November 23, 2020, Aubin emailed the UberEther team to discuss possible approaches to reaching UberEther's goals.  Aubin represented two options in which UberEther could either "1. Start with FedRamp Moderate (4 months), then post audit immediately start IL-4 (another 4 months), then post audit immediately start IL5 (Time TBD…different for each IL-5 package depending on sponsor requirements);" or "2. Go to IL5 out of the box (Time TBD based on sponsor requirements)."   With the first option, Aubin represented that UberEther would have a "FRModerate completed audit quickly (4 months) and an approved package on the FedRamp.gov website that you can sell to customers with only a FRModerate requirement."   Aubin assured UberEther that, regardless, *Anitian "[had] multiple customers in [option] 1 above, and customers who jump right to IL5 out of the box.*   It all depends on [UberEther's] preference/needs."

41.      Upon information and belief, Aubin's representations on or around November 23, 2020 were false.  Anitian did not have multiple customers that either (1) started with FedRAMP Moderate and then started IL-4 or IL-5 immediately post-audit; or (2) started IL-5 immediately.

42.      On or around January 7, 2021, Aubin represented in an email exchange with UberEther that Anitian would have UberEther's "solution READY FOR AUDIT in 60 days," which meant "all paperwork done and audit passed in 4 months."  Aubin represented that Anitian was "pulling projects out of [Anitian's competitors] left and right."   By example, Aubin represented that Anitian had recently brought on a customer who

> floundered [with an Anitian competitor] for months paying invoice after invoice. Switched to Anitian, [Anitian] had them done in 115 days (audit complete).  2 Jan 2020 to 17 Apri [sic] 2020…that was their FedRamp Moderate project with us.

11

> They are going to be moving to FedRamp High with us this year. They were looking at another 12 months with Coalfire and got pissed when they were given that updated timeline.

Aubin further represented that UberEther should not "lose focus on the speed to market [Anitian would] give [UberEther]." He represented that "NOBODY [could] do it faster and more successfully than Anitian."

43.     On or around January 13, 2021, Aubin provided a FedRAMP Moderate and FedRAMP IL5 pricing spreadsheet. The spreadsheet represented that the FedRAMP Moderate approach would cost a proposed total of $469,000 and the FedRAMP IL5 approach would cost a proposed total of $681,600.

44.     On or around February 12, 2021, Charles Johnson, Sales Engineer at Anitian, represented in an email exchange with UberEther that Anitian understood UberEther's target and the phases necessary to get there.

45.     Thereafter, on or around February 26, 2021, Johnson met with UberEther to discuss the project. Johnson represented that Anitian possessed scripts, automation, and templates that it would share with UberEther and help UberEther with any tweaking thereof if necessary. Aubin, also present at the meeting, further represented that Anitian could provide UberEther with "tons of scripts and automation." Johnson represented that Anitian had experience with automation in AWS and Azure, anything that is Terraform, and employees that knew Ansible pretty well. Johnson represented that Anitian could "help [UberEther] with getting that stuff automated… we've got a whole repository library… we've got images that already have the modules configured, the images are already hardened. You can roll with those images and we can work together to make sure that they are built out and part of your automation." Johnson further represented that Anitian had reference architectures that covered anything in

12

AWS, including hardened images.  He represented that Anitian had sufficient materials to meet UberEther's needs with some minor customization.

46.     Upon information and belief, the representations made by Johnson and Aubin during the February 26, 2021 meeting were false.  Anitian did not have the experience that it claimed.  Anitian did not have scripts, automation, or templates that it could provide to UberEther.  The repository library, reference architectures, and hardened images did not exist.  UberEther later discovered it would be required to purchase images from another vendor, the Center for Internet Security ("CIS"), which included an ongoing subscription cost.  Moreover, contrary to its statements, Anitian did not have a sufficient basis of materials that could be modified to meet UberEther's initial or, later, expanding needs.

47.     On or around February 24, 2021, Rudy Cifolelli, Vice President of Sales at Anitian, represented that in Github, Anitian hosted a whole set of scripts that Anitian would provide for use to UberEther.

48.     Upon information and belief, Cifolelli's representations on or around February 24, 2021, were false.  Anitian did not host a set of scripts in Github that UberEther could access.

49.     In sum, prior to UberEther and Anitian's execution of the agreements, various executives at Anitian, such as those named above in the preceding paragraphs, provided multiple representations, assurances, and promises to UberEther that it knew it could not deliver, including that:

      a. Anitian would provide UberEther existing locked down versions of the components Anitian has deployed with previous customers for use in UberEther's environment;

b.   Anitian would share their existing templates and scripts to deploy all the necessary agents and be reused within UberEther's platform;

c.   Anitian would be able to help UberEther get all the scripts automated as part of the services;

d.   Anitian possessed a repository library with modules configured and images already hardened and ready to use;

e.   Anitian had operating system images with the modules already configured and hardened so UberEther can get its components migrated as part of the service;

f.   Anitian had in its repository the reference architectures for any items in Amazon Web Services relevant to and generally suited for UberEther's efforts;

g.   Recognizing that staging was critical, Anitian would assist orienting UberEther for the deployment of automated systems and tools;

h.   Anitian would provide UberEther numerous scripts for automation capable of helping UberEther through the deployment of services without extra invoices;

i.   Anitian would patch its operating system images when it alerts UberEther the images are available and provide them to UberEther; and

j.   Anitian hosted a set of scripts in GitHub that UberEther could use.

14

50.      On or around March 31, 2021, in reliance on the representations described above, UberEther engaged Anitian to provide information security services and products to facilitate UberEther's establishment of an application environment that was audit-ready to meet the FedRAMP Moderate baseline.

51.      On March 31, 2021, Anitian proposed ("Moderate Proposal") to provide subscriber services to UberEther which included the provision of:

a.   Compliance Automation platform;

b.   Compliance Automation platform replica;

c.   Security Operation ("SecOps") services;

d.   Onboarding Services.

52.      The Compliance Automation Platform was to be installed into UberEther's CSP in one day.

53.      Onboarding Services were to commence within ten (10) days of Compliance Automation Platform deployment.

54.      After Onboarding Services were commenced, the service duration was to be sixty (60) days.

55.      Onboarding Services were to include documentation templates pre-filled out to the FedRAMP Moderate baseline.

56.      SecOps Services were intended to complement the Compliance Automation Platform and were to commence within thirty (30) days from deployment of the Compliance Automation Platform.

57.      The Moderate Proposal was accompanied by the MSA, signed on March 31, 2021, and intended to commence on April 15, 2021.

15

58.     Section 2.5 of the Agreement warrants, in pertinent part, that "(a) [Anitian] and each of its employees, consultants and subcontractors performing Services possesses the required skills to provide and perform the Services in accordance with this Agreement and the Proposal; and (b) the Services will be performed for and delivered to UberEther in strict conformance with the Proposal, in a diligent, workmanlike manner . . . ."  Upon information and belief, Anitian's representation in subclause (a) was false, as Anitian and its agents both lacked the required skills to furnish the Services in accordance with the Agreement and/or the Proposal.

59.     Section 2.12 of the MSA provides that nothing in the Agreement shall limit or exclude a party's liability for gross negligence, fraud, or intentional misconduct.

60.     Section 2.13 of the MSA provides that it may be immediately terminated by the non-breaching party upon notice to the other party if such other party materially breaches the Agreement and such breach remains uncured more than thirty (30) calendar days after receipt of the written breach notice.

61.     In pertinent part, Section 2.13 goes on to provide that in the event of a termination by UberEther due to an uncured material breach by Anitian, "(a) Anitian will refund any amounts for Products and Services that were prepaid for period after the effective date of termination; (b) [UberEther] will have no obligation to pay for any Products or Services ordered or subscribed to but not yet received pursuant to a Proposal; and (c) Anitian shall be liable to Subscriber for all other costs and damages resulting from such uncured material breach."

62.     Upon termination, the MSA states that all rights and obligations of both parties, including all licenses granted thereunder, shall immediately terminate.

63.     Throughout April 2021, key Anitian sales and engineering staff with whom UberEther was working abruptly left employment with Anitian.  Anitian never disclosed to

16

UberEther that the departure of these key employees would have an impact on the level of service it provided.

64.     To the contrary, throughout April and May 2021, Anitian's Founder and CTO, Andrew Plato, provided UberEther assurances and a plan forward to address revising the offered services to obtain an application environment that was audit-ready to meet the FedRAMP High baseline.  Furthermore, Anitian, through Plato and other executives such as Rudy Cifolelli and Chris Brimhall, repeatedly assured UberEther on several occasions that it had multiple customers pursuing FedRAMP High and/or DOD SRG certifications, and that it had experience pursuing those certifications.

65.     For example, on or around April 28, 2021, executives from Anitian and UberEther met to discuss the issues already occurring with Anitian's services.  Plato asked that UberEther "tell [him] what the issue is and I'll tell you what we can do."  Notably, in relation to what Anitian was able to provide, Plato stated that "[t]he long and short of it is, I don't know any better way to say this, I don't know what the hell Bill and Charles told you, but if that's what they told you, I'm sorry, that's false. We don't have that. It just doesn't work that way."  He stated that Anitian did not have a library of images and explained that when customers

> need hardened images, [Anitian] can point them to the hardened images [it] would recommend they use, which we always say use CIS hardened images, because you don't want to have to try to harden these on your own. That's a lot of work. So you just use the CIS hardened images, that you can get them off the marketplace, they cost a little bit more money, but in the long run, it'll save. So, that's an example of how we deal with that.

Plato claimed that Anitian maintained a library a long time ago and does sell some hardened images on the marketplace, but that "it's almost impossible for [Anitian] to maintain" a library because of the amount of variety amongst customers.  He stated again that "first and foremost, the key thing I want to make sure I communicate to you is again, whatever Bill and Charles told

17

you, I'm sorry that there was a miscommunication there. It sounds to me like they basically exaggerated what our repos are." Plato admitted that "[o]ur team screwed up. Those guys said stuff, dude, that's just false. I'm sorry." Plato further admitted that "[Anitian] wronged. We're going to right it. It's not going to be easy and it's going to be messy and we're going to probably lose money."

66.     Furthermore, on or around May 4, 2021, during a meeting between Plato, Chris Brimhall, and various UberEther executives, Plato and Brimhall outlined the changes and adjustments that Anitian could incorporate into its services to meet UberEther's needs. Plato represented that Anitian could support UberEther whether it planned to have all of its DOD customers on one FedRAMP High IL5 platform or have a separate FedRAMP High IL5 platform for each DOD customer. Plato and Brimhall represented that Anitian could set up a control plane that UberEther could use for all necessary environments, in which Anitian would use the same tooling and deploy the same stack for UberEther's use. Plato represented that Anitian would make a "couple of architectural changes," which would set UberEther up on a FedRAMP High path. Plato represented to UberEther at that point that Anitian would change to a different build and "pivot on a couple of things" to meet UberEther's needs. He assured UberEther that such changes would not "hurt" UberEther's FedRAMP Moderate authorization. Plato further assured UberEther that pivoting to address UberEther's FedRAMP High needs at that time would be better for UberEther as a company.

67.     On May 10, 2021, Chris Brimhall advised UberEther via e-mail that Anitian has "a minimum viable AWS build for High that we can update for this purpose. Not a problem!" Upon information and belief, this representation by Brimhall was false. Anitian's deployments were not automated and, in many cases, its software never worked. Furthermore, the 3PAO

18

advised UberEther that they would not have met FedRAMP High requirements with Anitian's services.

68.     Additionally, on or around May 17, 2021,  Paul Cimino e-mailed UberEther providing it with information about Anitian's receipt of security company awards.  Cimino represented to UberEther that receipt of the awards "further distanc[ed Anitian] from the field when it comes to compliance automation" and that "[w]hether it is FedRAMP, PCI-dss, SOC-2, GDPR, CMMC, OSCAL or any other compliance requirement, Anitian can get your SaaS or PaaS offering there faster and more cost effective than anyone in the market today."

69.     On or around May 24, 2021, Plato assured UberEther that Anitian would evaluate what it could do to move forward and the necessary division of effort on its part that would be required to meet UberEther's needs.  On or around May 25, 2021, Plato continued to assure UberEther by representing that Anitian would provide UberEther with one or two cloud engineers to take a template and customize it for UberEther's needs and integrate it with Anitian's platform, which it represented would take approximately 4 weeks to complete.  Plato represented that the end result of this approach would be a reusable template that works with Anitian's platform for UberEther's customer environments.  Plato represented that UberEther could then own that infrastructure template moving forward.  Plato also assured UberEther at this time that he would work on the SOW for a new agreement (the "High Proposal") to provide to UberEther.

70.     Upon information and belief, Anitian never intended to furnish the resources that Plato represented on or around May 25, 2021.  Rather, Anitian only represented that it would do so to placate UberEther and dupe it into committing to the High Proposal.  In fact, the promised cloud engineers never materialized.

71.     On May 27, 2021, Anitian stated that AWS provided Anitian the contact information of a resource who purportedly built the DOD framework for Anitian to call upon as needed to meet the DOD SRG IL5 requirements.

72.     On May 31, 2021, in reliance on Anitian's repeated and new assurances, the parties signed the High Proposal at Anitian's request, which the parties intended to function as an addition to the Moderate Proposal and an addendum to the MSA.  The timing of the proposal was intended to align with the end of the month and help with Anitian's sale numbers.  Although Anitian admitted that certain representations made prior to the MSA and Moderate Proposal were false, the full extent and implications of its deceptions were never revealed.  Anitian thus lured UberEther into entering the High Proposal by admitting to certain mistakes and promising corrective action going forward, all the while keeping UberEther in the dark as to the full extent of Anitian's deception.  All of the uncorrected misrepresentations that induced UberEther to enter into the MSA and Moderate Proposal therefore carried through and induced UberEther to enter into the High Proposal.

73.     The High Proposal included the provision of:

    a.  Compliance Automation platform upgrade to FedRAMP High

    b.  Compliance Automation platform replica upgrade to FedRAMP High

    c.  Security Operation (SecOps) services upgrade to FedRAMP High

    d.  Fortinet NGFW for the Primary and Replica environment(s)

74.     Under the High Proposal, UberEther was to be charged an additional $167,625 for these upgrades, payable in four consecutive equal quarterly installments of $41,906.25.

75.     The target result of the UberEther application environment for UberEther's software as a service application was to be an "Audit-Ready FedRAMP High with DOD SRG IL5 environment."

76.     That configuration was intended to address two (2) architectures, comprised of one (1) primary and one (1) replica, both of which were to have a security framework identified as "FedRAMP High with DOD SRG IL5."

77.     Onboarding Services were to include documentation templates pre-filled out to FedRAMP High with DOD SRG IL5.

78.     The start date for these services was to be May 31, 2021.

79.     Onboarding Services were to begin within five (5) days of the service date, or by June 5, 2022, and last sixty (60) days.

80.     Appendix A of the High Proposal further defined the Anitian Compliance Automation Platform: FedRAMP HIGH IL5 (AWS) and reaffirmed that a set of FedRAMP documentation templates, including the System Security Plan, pre-populated with configuration information from the Anitian Compliance Automation Platform, would be delivered during Onboarding Services.

81.     Appendix B of the High Proposal further defined the Onboarding Services for a FedRAMP HIGH IL5 (AWS) Compliance Automation Platform.

     a.  Anitian was to provide engineers to assist UberEther with integrating the in-scope environment ("ISE"), defined as both the Compliance Automation Environment ("CAE") and the application environment ("AE").

     b.  These "DevOps" engineers were also to advise UberEther on best practices for ensuring security and compliance within the Subscriber Application environment.

  c. Anitian was to provide subject matter experts to advise UberEther on completing the relevant compliance documentation, including:

    i. Advising UberEther on the control requirements specific to the Compliance Automation Platform;

    ii. Providing feedback to content UberEther writes; and

    iii. One full round of documentation review for audit readiness.

  d. The Onboarding Services were also to provide UberEther the following deliverables:

    i. Compliance Automation Platform Onboarding Deployment Request for Information ("RFI")

    ii. Compliance Automation Platform Onboarding User Access RFI

    iii. SecOps Contacts (if purchased)

    iv. Compliance Documentation Gap Assessment

    v. Compliance Automation Platform Onboarding Project Charter

    vi. Compliance Automation Platform Onboarding Project Plan

    vii. Contact Lists, Anitian and UberEther

    viii. Contact RFI

    ix. Project portal with weekly project status reports

    x. Set of compliance documentation templates pre-filled with content from the Compliance Automation Platform environment

    xi. Documentation Automation platform

82. SecOps were to begin not more than 30 days from deployment of Compliance Automation Platform, or by June 30, 2021.

83.     Appendix C of the High Proposal described the SecOps Services agreeing to perform security and compliance monitoring of the in-scope environment on a 24 hours per day, 7 days per week, 365 days per year basis. Additionally, Anitian will manage the CAE components.

84.     The SecOps services Anitian was to provide include:

a.   A base set of administrative functions for the CAE, including:

    i.   Alert management

    ii.   Patching

    iii.   Configuration tuning and updates

    iv.   Tuning security controls; and

    v.   Change management.

b.   Ongoing review of security and compliance data and controls, including:

    i.   Validate the operational state of controls, alerts, and logging;

    ii.   Investigate events for signs of compromise, abuse, infiltration, exfiltration, or environment degradation; and

    iii.   Review any blocked or detected threats and determine appropriate response.

c.   Provide initial response to any detected or suspected threats.

d.   Implement a library of security alerts, and actively add, tune, and modify alerts based on emerging threats or environment changes.

e.   Implement a library of automated searches, queries, and correlations in the SIEM to optimize the detection of attacks, malicious behavior, or non-compliant activities.

23

 f. Setup automated responses to respond to threats or operational alerts.

 g. Tune endpoint security agents for optimal, automated detection, and response.

 h. Manage vulnerability scanning for the ISE.

 i. Provide expanded assistance to UberEther with completing the required documentation for the FedRAMP Plan of Action and Milestones ("POA&M") reports, including:

  i. Document vulnerabilities for both the CAE and AE in the required POA&M templates.

  ii. Manage asset lists for the ISE.

  iii. Collaborate with Subscriber on analyzing vulnerabilities and Deviation Requests ("DRs") for the AE.

  iv. Provide guidance on remediation efforts for Subscriber's applications, where possible.

  v. Review UberEther's remediation efforts and risk assessments and provide feedback.

 j. Perform network and system-level penetration testing of the publicly addressable, ISE on a quarterly basis to assess general security health.

 k. Perform routine sweeps of the Internet and "DarkWeb" to identify security threat or data exposure that may impact UberEther.

 l. Provide that personnel fulfilling SecOps managed service are U.S. citizens with a thorough set of background checks.

 m. Setup secure, encrypted repositories to manage any forensics, compliance, or security analysis data that requires such storage.

24

n.  Provide up to twenty (20) hours per year of audit support for the initial or any follow-on audits.

o.  Include a set of customized dashboards.

p.  Implements data from threat intelligence feeds into the SIEM.

85.     Anitian SecOps and UberEther had defined responsibilities in the AE and CAE, including description of events where the parties were to collaborate and assist the party with primary responsibility.

**Anitian's Contract Performance Failures**

86.     From the beginning of Contract performance, Anitian understood that UberEther was scheduled for its 3PAO audit and that if the schedule slipped it would be hard for UberEther to get back on the schedule in a timely manner.

87.     On or around April 16, 2021, Anitian and UberEther teams began execution of the FedRAMP Moderate Proposal with a scheduled kickoff meeting with Delivery Assurance included.

88.     After Anitian was to begin performance, Anitian advised UberEther that its team was backlogged and was told that Anitian would need more than a week to schedule the necessary discovery calls to discuss UberEther's environment, architecture, components, etc.

89.     After signing the Moderate Proposal, Anitian's statements became inconsistent with the assurances and promises that it made—and which were recorded—to UberEther during discussions and sales team meetings during the inducement period.

90.     These post-contractual deviations from Anitian's prior assurances (i) included clarifications and changes to Anitian's true capabilities, (ii) increasing costs for deploying containers versus instances, (iii) Anitian's new concerns about Federal Information Protection

Standard ("FIPS") compliance with virtual private network ("VPN") capabilities, deployment of a configuration management server (git) within the tenant environment, (v) denial of access to Anitian's library of code, scripts, and artifacts to be utilized by UberEther to build, integrate, and deploy Anitian's offering.

91.     On or around April 16, 2021, UberEther provided Anitian transcripts of February meetings with Anitian leadership and executives, such as Bill Aubin and Charles Johnson, reminding Anitian of its previous promises regarding system components.

92.     Anitian was aware of the discrepancies between what its delivery team could actually deliver and the solution promises made by Anitian's sales and senior executive teams.

93.     On or around April 27, 2021, at the request of Anitian, the parties met to discuss Anitian's performance shortfalls.

94.     During a meeting on or around April 28, 2021, UberEther advised Anitian executives, including Andrew Plato, Katherine Burgess, and Scott Miller, of its concerns over the misleading statements—such as that Anitian did not include the cost of containers within the proposed price, Anitian did not have scripts for UberEther's use, and that UberEther would need to purchase images from another vendor—made during the Moderate Proposal kickoff meeting. Anitian admitted to its faults and Plato promised that Anitian would fill the gaps in the stated requirements of the platform and do whatever it takes to make UberEther successful.

95.     Throughout May 2021, UberEther worked in good faith with Anitian to use Anitian's then-existing services to move forward despite the failures in Anitian's Compliance Automation Platform's promised capabilities and to address the changes from FedRAMP Moderate to FedRAMP High and the DOD SRG IL5 requirements.

26

96.     On or around May 24, 2021, UberEther suggested Anitian use the AWS DOD Compliant Architecture in an effort to save time and costs.  Anitian agreed and planned to craft a solution for UberEther based on that suggestion.

97.     With respect to the use of the AWS DOD Compliant Architecture templates, Anitian stated that it would deploy and configure the Next Generation Firewall to blend the AWS framework with the Anitian platform and provide a cloud engineer (or two) to customize templates for UberEther's needs, and integrate it with the Anitian platform.

98.     In May 2021, Anitian advised UberEther that the use and integration of the AWS DOD Compliant Architecture needed to meet the DOD SRG IL5 requirements would take four (4) weeks to implement and require a new Statement of Work.

99.     In June 2021, UberEther was forced to reassign resources to help close the gaps between Anitian's capabilities and promises.

100.    On or around June 11, 2021, Anitian sent UberEther an updated Addendum after Anitian made a technical mistake demanding that Anitian procure new software (Tenable Security Center, Sysdig Secure, and Burp Suite) for UberEther's environment.  Anitian advised that while the purchases would require UberEther expend no immediate costs in year one, costs will be incurred in future years.

101.    On or around June 16, 2021, Anitian confirmed that it had everything it needed to start the Compliance Automation Platform deployment.

102.    On or around June 29, 2021, UberEther identified unexpected issues and multiple concerns with, among other things:

    a.  UberEther needing to completely re-baseline and rebuild its customer account environment;

27

b.   UberEther needing a plan from Anitian to deploy and integrate the replication environment;

c.   Anitian failing to provide notes that contain any impact analysis or guidance from Anitian about UberEther's components and the "right" way to architect the solution for DOD SRG IL5;

d.   UberEther needing to alert Anitian that no activity had been found within the compliance automation VPC which was provided to Anitian 14 days prior;

e.   UberEther advising Anitian that Anitian was not providing the necessary deployment support and guidance for Anitian's components;

f.   UberEther advising Anitian that the System Security Plan ("SSP") Anitian delivered was keyed to the FedRAMP Moderate and not the FedRAMP High baseline as required.  The SSP had numerous missing controls and did not include the DOD SRG IL5 controls;

g.   UberEther expended significant resources over the course of two weeks to check Anitian's work and manually crosswalk the FedRAMP and DOD documents to ensure that Anitian's generated documents were including the appropriate control and requirements;

h.   The Vision data fields mapping to the wrong policy/procedure documents or not mapping at all; and

i.   Anitian being unable to produce an incident response plan, which was part of their documented responsibilities within the SecOps team.

103.    In a June 29, 2021 email, Chris Brimhall admitted to Anitian's "abnormal performance," recognized the issues with Smartsheet, agreed that UberEther should have been included in the meeting with AWS, and assured UberEther of no further miscommunication.

104.    On or around August 10, 2021, Anitian advised UberEther that it purchased the wrong FortiGate Next Generation Firewall and insisted that UberEther use, instead, the Amazon Web Application Firewall, which would incur additional operational costs to UberEther and the supporting Amazon Web Application Firewall Manager was not approved for DOD use, thus further increasing operational costs.

105.    Despite its one-day assurances, the Anitian Compliance Automation Platform did not deploy until June 16, 2021, and the Onboarding Services continued to run well past their sixty (60) day window.

106.    Anitian was still experiencing delays through August 2021, due to its inexperience addressing the demands of the FedRAMP High/DOD SRG IL5 environment.

107.    During a meeting on or around August 23, 2021, Anitian senior leadership assigned Ryan Farris to "run point" on the Anitian effort to ensure UberEther met its deadlines. Anitian agreed to downgrade the FortiGate (but would not provide the part number) and UberEther would also run the Amazon Web Application Firewall which Anitian's team had more experience with to lessen their costs.

108.    In an August 24, 2021 email, UberEther advised Anitian of additional issues further delaying the Onboarding Services another 2-3 weeks.   Anitian admitted to the shortcomings and recognized that it needed to add more clarity around the timeline for its team with an acute focus on execution.

109.    In an August 24, 2021 email, UberEther advised Anitian that the delays being caused by Anitian were a result of, in pertinent part, the Anitian team admitting to not having the necessary product experience to resolve issues surrounding misconfiguration and Anitian not having the required FedRAMP Authorization Boundary Diagram templates, even for their own services, which had been required for over six (6) months as part of the submission package.

110.    In an email dated August 30, 2021, Anitian advised UberEther that it worked with AWS to obtain a Migration Accelerator Program funding of $300,000 on behalf of UberEther. Although expected to be applied to the current UberEther bills to reduce the overall costs, Anitian advised UberEther that the funding could only be applied to future contracts and pricing and could not be approved retroactively.

111.    As of September 2, 2021, UberEther was advised of even more delays pushing delivery into mid-September and told Anitian that the delays were impacting UberEther's scheduled RAR.

112.    As of September 2, 2021, UberEther was still awaiting configurations, installations, and deployments for a number of key products and services, including but not limited to FortiGate, Amazon Web Application Firewall, Sysdig, Burp Suite, Auditbeat, and updated SecOps/Anitian Tenant Diagrams. Anitian had over thirty-five (35) artifacts that had to be completed and provided to the 3PAO assessors still open due to these components not being configured properly. Additionally, Anitian still had not updated their schedule to provide any confirmation of their delivery date.

113.    On September 2, 2021, UberEther advised Anitian that if missing products were not corrected by the Tuesday, September 7, 2021 target date, UberEther would miss its RAR start date and be assessed a 10% penalty.

114.    In a September 2, 2021 email, Anitian recognized the need to improve its "planning through the delivery phase" in light of the issues raised by UberEther. Anitian committed to the following deliverables and schedule:

    a.   September 3, 2021

        i.   Sysdig validation

        ii.   Burp Integration and Validation

        iii.   Turn On SecOps/Enforce Yubikey MFA

    b.   September 7, 2021

        i.   FortiGate, including traffic flow, critical items through validation

        ii.   AWS Web Application Firewall

        iii.   Documentation updates

115.    On September 5, 2021, UberEther identified that Anitian was proposing the use of a non-approved version of Fortinet FortiGate. In an email response dated September 7, 2021:

    a.   Anitian admitted the proposed FortiGate version was not approved by NIAP for the DOD and Anitian would need to re-install and subsequently lose configurations that were put in place.

    b.   Anitian also advised UberEther that Anitian failed to purchase enough FortiTokens to use with the licenses thus causing UberEther to incur additional unforeseen costs the FortiGate solution.

116.    Anitian missed its September 7, 2021 deadline.

117.    As of September 8, 2021, Anitian's material performance deficiencies were beginning to compound: FortiGate was delivered with nothing configured; UberEther still did not have access to all the scanners and endpoints to manage the systems and provide the

documentation to its assessors; and UberEther was still waiting on significant documentation from Anitian. Anitian also changed the way their SecOps team planned to access the environment at the last minute, forcing UberEther to update pages of documentation and diagrams before submitting to the assessors.

118.    On September 8, 2021, Anitian finally initiated introductions to the SecOps team to begin configuring the security controls believing the project was in a "steady state." Transition did not actually start until October 1, 2021, far beyond the 60-days window advertised and agreed upon.

119.    On September 8, 2021, UberEther decried the necessary level of back-checking it was required to do of Anitian's services and expressly questioned whether Anitian was able to meet the requirements for the DOD SRG, Cloud CCPG, and Best Practices Guides that were provided to Anitian by UberEther months prior at an impact level 5.

120.    On September 19, 2021, UberEther was forced to buy a Burp Professional license in production after Anitian admitted that the features needed for FedRAMP High and DOD SRG IL5 were not available in the previously procured Enterprise license after Anitian installed a temporary evaluation license within the UberEther production environment which had expired.

121.    On September 20, 2021, UberEther's 3PAO began the RAR.

122.    On or around September 21, 2021, UberEther discovered that the manner in which Anitian intended to handle and provide certain licenses to UberEther was raising concerns with the FedRAMP Project Management Office.  FedRAMP's noted concern was confirmed by Anitian on October 4, 2021.

32

123. On September 23, 2021, the 3PAO paused the RAR due to the volume of issues found with Anitian's non-compliance at FedRAMP High and no requirements meeting DOD SRG IL5.

124. As part of the 3PAO process, Anitian provided a copy of UberEther's MSA and Anitian Contracts to the 3PAO so that the 3PAO and FedRAMP board could review and assure the ownership and control of necessary services, documents, processes, and procedures remains with UberEther.

    a. Upon information and belief this FedRAMP requirement and direction was a result of the FedRAMP PMO having concerns over prior Anitian attempts to retain licenses for previous CSP customers in a manner that would risk leaving government customers in a vulnerable state.

125. On September 24, 2021, UberEther alerted Anitian that the discovery and penetration testing scans provided by an Anitian engineer did not scan all the servers in the inventory as they were required to do under the FedRAMP High and DOD SRG IL5 requirements resulting in missing 26 of the 52 servers in the environment.

126. As of September 24, 2021, Anitian continued to work with the 3PAO on the top priority items but was still unable to ingest logs from the FortiGate into their SIEM. Anitian admitted to gaps in the access control and authorization components of the system security plan.

127. On September 27, 2021, UberEther advised Anitian of the damages it was facing due to Anitian's persistent misrepresentations and failure to perform as agreed upon. UberEther identified losing one million dollars a month due to lost bookings.

33

128.     On September 27, 2021, UberEther reminded Anitian that it must still install the replication site to be "audit ready" and that multiple of Anitian's own components showed high findings out of compliance with the vulnerability scans performed.

129.     On September 27, 2021, UberEther alerted Anitian to an AWS Critical finding within their deployed platform which exposed UberEther's environment directly to the Internet which was not investigated for over 48 hours contrary to the SecOps services agreement.

130.     On September 29, 2021, the 3PAO provided Anitian with a full "gap list" of the items that must be completed by October 8, 2021 and reminded Anitian that the requirements are not just for FedRAMP High, but also DOD IL5 that must be met for this RAR. This guidance includes the verbiage that all pieces of the environment must apply the appropriate DISA security requirements.

131.     On September 29, 2021, UberEther advised Anitian that UberEther planned to start the Security Assessment Report processing within forty-five (45) days and that all items must be completed at that time for the full assessment.

132.     On September 30, 2021, Anitian requested and received a copy of UberEther's Boundary Diagrams because Anitian had been unable to produce its own in a compliant format and the FedRAMP PMO was requesting it.

133.     On September 30, 2021, UberEther reminded Anitian that the Sysdig component Anitian procured for the environment did not meet DOD requirements and that Anitian still needed to provide a solution.

134.     On October 4, 2021, UberEther raised concerns that Anitian's communication directly with FedRAMP without including DISA may be hindering UberEther/Anitian's

progress. It reminded Anitian that it was DISA, not FedRAMP, that was permitted to ultimately assess UberEther so that it may sell to the DOD.

135.    Contrary to Anitian's purported experience and their agreed upon obligations, it was UberEther who provided Anitian with eight (8) additional DOD documents and over 200 DOD Security Technical Implementation Guides to ensure Anitian had the necessary requirements and security guides in hand to assist Anitian with its compliance effort.

136.    On or around late September 2021, Anitian hired outside vendors, Landers and Company ("Landers"), due to Landers' purported experience with meeting FedRAMP High and DOD SRG IL5 requirements.

137.    On October 4, 2021, UberEther advised Anitian of a number of open issues and that failure to pass the RAR and any additional slips in the date will impact UberEther's customer and put the customer's program at risk. UberEther again raised concerns about meeting DOD SGR IL5 requirements.

138.    On October 5, 2021, UberEther advised Anitian that some of its solutions were not approved by the DOD for use and that if certain tests were not completed by Friday, October 8, 2021, UberEther would not pass the RAR.

139.    On October 5, 2021, Anitian agreed to have run certain tests by Friday, October 8, 2021, so as not risk failing the RAR.

140.    Contrary to their professed experience, Anitian admitted that it selected a Sysdig component that did not meet DOD requirements and Anitian was still searching for alternatives and documenting the problems with the unapproved vulnerability database.

141.    During a call between UberEther, Anitian, the 3PAO, and AWS Federal on October 7, 2021, Anitian was advised that it needed to apply the DOD IL5 STIG requirements

35

where applicable. AWS Federal also reminded Anitian that they had been advised of this requirement before.

142.    On October 8, 2021, UberEther alerted Anitian that the 3PAO was not seeing the cooperation and progress they expected from Anitian. The 3PAO stated that it will not move forward with UberEther's RAR given the open items and issues with Anitian's services.

143.    On October 8, 2021, UberEther met with Anitian to address Anitian's procedural and technical issues raised by the 3PAO.

144.    On October 10, 2021, via email, UberEther alerted Anitian that, contrary to its purported expertise, Anitian's solutions failed to meet FedRAMP HIGH or DOD SRG IL5 and also did not reflect Anitian's "standard" FedRAMP moderate baseline, and consisted of deficient diagrams unable to meet UberEther's environment's needs.

145.    On October 11, 2021, the 3PAO alerted UberEther that the RAR must be rescheduled due to incomplete work by Anitian, not only incurring a rescheduling fee but also incurring a two-month delay in the RAR, as the 3PAO did not have availability until December 13, 2021.   The same day, UberEther alerted Anitian that it once again missed a submission deadline, resulting in an additional loss of two million dollars in potential revenue for UberEther because a compliant platform had still not been delivered. In response, Anitian claimed that it was not aware of the RAR deadline and needed a copy of a draft RAR to move forward.

146.    On October 12, 2021, UberEther reported to Anitian that, as confirmed by the 3PAO, the Security Technical Implementation Guides ("STIGs") provided by Anitian did not meet the DOD's requirements. Specifically, Anitian failed to provide the artifacts demonstrating that its components were properly implemented in conformance with the DOD requirements.

36

The same day, UberEther alerted Anitian that its documents falsely claimed that the DOD does not have approved container STIGs, scanning software, or container STIG scanners.

147.    On October 12, 2021, the 3PAO confirmed that the documents provided by Anitian failed to meet DOD requirements, and stated that:

    a.    Anitian's documentation (*e.g*., policies, procedures, runbooks) must be provided in regard to the process for how the controls are being implemented as a cohesive whole under the ownership and control of UberEther and not as supplemental evidence;

    b.    Anitian's additional permissions within the environment are an issue as UberEther cannot monitor Anitian's escalated privileges, audit logs, or change management for any changes that must be approved by UberEther; and

    c.    All information must remain in the UberEther boundary, yet Anitian's SecOps Service Portal was outside of the defined boundary and cannot contain any information or approvals; rather, all information must be moved into the UberEther CSP boundary utilizing UberEther's standards, policies, and procedures.

148.    On October 13, 2021, Anitian, via email, confirmed that it had a "clear understanding of the required timelines" regarding the RAR process, but Anitian's understanding proved to be erroneous.

149.    On October 13, 2021, via email, UberEther responded to Anitian's erroneous understanding of the RAR timeline by noting that delaying the RAR another forty-five (45) days, based solely on Anitian's performance and design failures, was unacceptable, and that Anitian's failures have placed at risk UberEther's ability to be granted an ATO due to its customer's pressing need for an authorized CSP.

150.    UberEther requested that Anitian provide an updated RAR timeline by October 14, 2021, and set a deadline of October 20, 2021 for Anitian to complete any artifacts.

151.    During performance, Anitian admitted that it had "a very long tail of integration issues which were unexpected," indicating that the FedRAMP High solution was neither repeatable nor previously deployed or tested prior to deployment as had been promised.

152.    Contrary to its initial promises and assurances that the DOD SRG IL5 solution would be automated from the start of performance, Anitian only admitted that "some of the deployment is manual" after performance had begun.

153.    At the tail end of performance, Anitian admitted that "we will have several learnings which will improve our ability to operate with our customers," indicating that Anitian used the UberEther project as a test to develop a heretofore unproven solution.

154.    On October 15, 2021, Anitian provided UberEther with a non-exhaustive list of fifteen (15) additional Security Operation items that needed to be addressed prior to completion of the RAR based on their continued discussions with the 3PAO and FedRAMP.

155.    On October 18, 2021, via email, UberEther responded to Anitian's STIG and document updates by noting that Anitian's updates were incomplete, did not include the listed items the 3PAO requires to complete the RAR validation, and placed the eventual customer at risk.

156.    On October 20, 2021, UberEther provided an update to Anitian that one of Anitian's analysts misconfigured the UberEther production environment causing an unforeseen $20,000 bill to be accumulated and also that Anitian's SecOps was unable to detect a 2,000% increase in traffic during that time.

157.    On October 20, 2021, Anitian missed their own scheduled meetings to configure Burp suite for discovery and penetration testing scans due to not having experienced technical personnel available.

158.    On October 20, 2021, Anitian missed another set of internal deadlines due and provided incomplete system reports requiring additional and unanticipated costs and resources to be expended by UberEther.

159.    On October 31, 2021, via email, the 3PAO alerted UberEther that Anitian continued to request meetings on UberEther's environment without UberEther present and that Anitian's documentation and systems continued to fall short of DOD requirements.

160.    On November 4, 2021, via email, the 3PAO delivered comments on an Anitian plan indicating that its planned approach would need to be significantly modified to become compliant and some items "will never happen" per FedRAMP and DOD as it was deficient and would not be approved.

161.    On November 11, 2021, the 3PAO delivered its draft RAR to UberEther. It identified numerous shortcomings and "notable weaknesses" solely and directly attributable to Anitian.

162.    Due to the results of the RAR, UberEther was required to re-accomplish and re-submit for a new assessment that, due to 3PAO scheduling, cannot be accomplished sooner than April 2022.

163.    In accordance with Section 2.13 of the MSA, UberEther provided Anitian with a seven (7) page "Notice of Material Breaches of the Master Agreement and Request to Cure" ("Request to Cure") on November 17, 2021.

164.     The Request to Cure identified the Agreement terms that Anitian materially breached or continued to materially breach and requested that Anitian provide "a written, detailed plan of action to cure the above-mentioned material breaches and sufficiently compensate UberEther" by November 29, 2021, and that, pursuant to MSA Section 2.13, should Anitian not cure the material breaches identified in the Request to Cure within thirty (30) calendar days from receipt, the Agreement would immediately terminate.

165.     Anitian failed to fully respond to each of the identified material breaches expressly listed in UberEther's Request to Cure.

166.     None of Anitian's partial responses to the Request to Cure describe specific efforts or a detailed plan of action to address the ongoing breaches that transcend the issues highlighted in the RAR or the actions and promises perpetrated by Anitian during its course of performance.

167.     As a result of Anitian's failure to cure the identified material breaches within thirty (30) calendar days, and in conformance with MSA Section 2.13, UberEther provided written notice of immediate termination of the parties' rights and obligations under the MSA on December 17, 2021.

168.     To date, UberEther has paid $437,614.17 directly to Anitian.

169.     To date, Anitian has not provided to UberEther an "Audit-Ready FedRAMP High with DOD SRG IL5 Environment."

## <u>COUNT ONE - BREACH OF CONTACT</u>

170.     The allegations contained in the preceding paragraphs are incorporated herein by reference as if repeated verbatim.

40

171.    UberEther and Anitian entered into three related agreements: the MSA, on March 31, 2021; The Moderate Agreement, on March 31, 2021; and the High Agreement on May 31, 2021, (collectively "the Contracts") all of which are valid and binding between the parties.

172.    Anitian knew that UberEther had significant government clients waiting for UberEther to obtain a passing or ready RAR.

173.    UberEther has faithfully discharged its obligations under the Contracts and in good faith performed—above and beyond—all conditions demanded of it.

174.    In material breach of the Contracts, Anitian failed to deliver a repeatable, low-risk process so that UberEther will be "audit ready" for the FedRAMP High with DOD SRG IL5 Environment within sixty (60) days.

175.    In material breach of the Contracts, Anitian failed to meet critical project deadlines.

176.    In material breach of the Contracts, Anitian failed to provide adequate and proper project deliverables and materials.

177.    In material breach of the Contracts, Anitian failed to provide qualified and competent personnel to provide the agreed upon service and support in the Contracts.

178.    In material breach of the Contracts, UberEther was required to expend significant additional and unforeseen time, money, and resources to augment Anitian's shortcomings, oversights, and patent failures in delivery.

179.    Anitian materially breached the MSA's Limited Warranty provision by repeatedly failing to successfully re-perform, replace, or repair nonconforming services and deliverables.

180.    Despite Anitian being hired to make UberEther "audit ready," the 3PAO would not forward the RAR and assigned responsibility for its shortcomings and failings to Anitian.

41

181.    After the 3PAO admonished Anitian's effort under the RAR, Anitian admitted it was not prepared to proceed to the Security Assessment Review.

182.    Following the issuance of UberEther's Request to Cure, and well aware of UberEther's dissatisfaction, Anitian was still unable to automatically identify unplanned inventory changes to UberEther's networks, contrary to standards in even the FedRAMP High controls, and unwilling to check routine audit logs to confirm the control was in place.

183.    Anitian's breaches of the Contracts, as described above, were a result of Anitian's gross negligence, fraud, and/or its intentional misconduct.

184.    As a direct and proximate result of Anitian's material breaches of the Contracts, Plaintiff has suffered substantial financial and reputational damages and losses.

## COUNT TWO – FRAUD IN THE INDUCEMENT

185.    The allegations contained in the preceding paragraphs are incorporated herein by reference as if repeated verbatim.

186.    Anitian's above-described statements and promises to UberEther were false in that Anitian did not perform its services in accordance with its representations, did not possess the necessary experience as represented, and did not completely perform its contractual duties and obligations in its advertised and agreed-upon time frame or necessary quality.

187.    Having been reminded repeatedly by UberEther as to the nature of its representations, Anitian knew or should have known of the falsity of its representations to UberEther.

188.    Contrary to Anitian's professed prior of experience in meeting the FedRAMP High and DOD SRG requirements, Anitian had no such experience and instead attempted to use UberEther to gain the experience they claimed to already possess.

189.    Despite paying for Anitian's purported experience, it was UberEther who routinely provided Anitian with the necessary training, documents, and maintenance Anitian required to perform the agreed-upon tasks.

190.    In furtherance of their initial and ongoing fraud, Anitian demanded and received payments from UberEther during performance.

191.    Anitian's representations were intended to, and did in fact, induce UberEther to enter into the Contracts with Anitian and further served to encourage UberEther to expand and continue the services being provided by Anitian.  UberEther would not have entered into the MSA, Moderate Proposal, or High Proposal had Anitian correctly represented its experience, the status of other ongoing projects, or that it lacked the materials it claimed to possess.  Nor would UberEther have agreed to Section 2.12 of the MSA had Anitian not misrepresented the foregoing.

192.    UberEther justifiably relied on Anitian's false representations as true statements because (1) it lacked knowledge to understand otherwise and (2) UberEther specifically inquired into and contracted for an elevated security inquiry as material terms of its Contract and the services to be performed by Anitian, which Anitian assured would be performed as agreed upon.

193.    As a direct and proximate result of UberEther's reliance on Anitian's false representations, UberEther has suffered significant damages and pecuniary losses due to the loss and immediate and future opportunities for the offerings it could provide.

## **PRAYER FOR RELIEF**

WHEREFORE, UberEther prays that this Court grant the following relief:

A.      A judgment that Anitian fraudulently induced UberEther into believing that Anitian had the necessary and requisite experience to obtain for UberEther an "Audit-Ready FedRAMP High with DOD SRG IL5 Environment" in the agreed upon time;

B.      A judgment that UberEther entered into the Agreement and Contracts premised on Anitian's stated experience and promised skill sets in order to obtain an "Audit-Ready FedRAMP High with DOD SRG IL5 Environment;"

C.      A judgment that Anitian materially breached its Agreement and Contracts with UberEther by failing to provide the requisite experience, services, products, and outputs necessary for UberEther to obtain an "Audit-Ready FedRAMP High with DOD SRG IL5 Environment;"

D.      A judgment that, in light of Anitian's gross negligence, intentional misconduct, and/or fraudulent course of conduct and misrepresentations, and UberEther's reasonable reliance thereupon, Anitian must pay direct, consequential, indirect, punitive, and other special damages or relief for injuries to UberEther totaling no less than $20,191,292 as a result of Anitian's myriad and material breaches of contracts;

E.      Anitian be required to reimburse Plaintiff for the attorney's fees and costs of this action, as provided in the Agreement, as well as termination-related attorney fees, pre-judgment and post judgment interest; and

F.      All other relief, including treble damages, that the Court deems appropriate.

## **JURY DEMAND**

UberEther requests a trial by jury to all issues so triable.


Dated: March 16, 2022                                           MCCARTER & ENGLISH, LLP

                                                                         */s/ Daniel M. Silver*
                                                                         Daniel M. Silver (#4758)
                                                                         Chelsea A. Botsch (#6715)
                                                                         Renaissance Centre
                                                                         405 N. King St., 8th Floor
                                                                         Wilmington, DE 19801
                                                                         Tel: (302) 984-6300
                                                                         dsilver@mccarter.com
                                                                         cbotsch@mccarter.com

                                                                         *Attorneys for UberEther, Inc.*