## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| UBERETHER, INC.,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>ANITIAN, INC.,<br><br>　　　　　　　Defendant. | C.A. No. 22-88 RGA<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

### <u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

Dated:  April 25, 2022

Daniel M. Silver (#4758)
Chelsea A. Botsch (#6715)
**MCCARTER & ENGLISH, LLP**
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
cbotsch@mccarter.com

*Attorneys for Plaintiff UberEther, Inc.*

## TABLE OF CONTENTS

I.      INTRODUCTION ..........................................................................................................1

II.     NATURE AND STAGE OF THE PROCEEDINGS ..........................................................1

III.    SUMMARY OF THE ARGUMENT ................................................................................2

IV.     STATEMENT OF FACTS ..............................................................................................2

        A.      BASIS OF UBERETHER AND ANITIAN'S RELATIONSHIP .........................2

        B.      INITIAL INDUCEMENT .................................................................................3

        C.      EXECUTION OF THE AGREEMENTS AND FURTHER
                INDUCEMENT .................................................................................................5

V.      LEGAL STANDARD......................................................................................................7

VI.     ARGUMENT ..................................................................................................................8

        A.      THE MSA DOES NOT BAR UBERETHER'S RELIANCE ON
                ANITAN'S FRAUDULENT STATEMENTS ......................................................8

        B.      UBERETHER SUFFICIENTLY PLEADS A CLAIM FOR FRAUD.................16

                1.      UberEther has sufficiently pled Anitian's knowledge of falsity
                        and fraudulent intent ..................................................................................16

                2.      UberEther's allegations do not contradict its justifiable reliance
                        on Anitian's false representations................................................................18

                3.      UberEther alleges that Anitian falsely represented its
                        experience, resources, and skills................................................................20

VII.    CONCLUSION..............................................................................................................20

ME1 40346544v.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abry Partners V, L.P. v. F & W Acquisition LLC*,
    891 A.2d 1032 (Del. Ch. Ct. Feb. 14, 2006) ...................................................................9, 10

*Airborne Health, Inc. v. Squid Soap, LP*,
    984 A.2d 126 (Del. Ch. Ct. Nov. 23, 2009) ..........................................................................15

*Anschutz Corp. v. Brown Robin Capital, LLC*,
    2020 WL 3096744 (Del. Ch. Ct. June 11, 2020) ...................................................................13

*Anvil Holding Corp. v. Iron Acquisition Co., Inc.*,
    2013 WL 2249655 (Del. Ch. Ct. May 17, 2013) ............................................................13, 14

*Argueta v. U.S. Immigration and Customs Enforcement*,
    643 F.3d 60 (3d Cir. 2011) ......................................................................................................7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................7, 8

*Aveanna Healthcare, LLC v. Epic/Freedom, LLC*,
    2021 WL 3235739 (Del. Super. Ct. July 29, 2021) ...........................................................9, 11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................7, 8

*Brinkmeier v. BIC Corp.*,
    733 F. Supp. 2d 552 (D. Del. 2010) ......................................................................................18

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) .............................................................................................8, 18

*Heritage Handoff Holdings, LLC v. Fontanella*,
    2019 WL 1056270 (D. Del. Mar. 6, 2019) ...........................................................................13

*Infomedia Grp., Inc. v. Orange Health Sols., Inc.*,
    2020 WL 4384087 (Del. Super. Ct. July 31, 2020) ................................................................9

*Kronenberg v. Katz*,
    872 A.2d 568 (Del. Ch. Ct. May 19, 2004) ............................................................9, 10, 13, 14

*Kuhn Constr. Co. v. Diamond State Port Corp.*,
    2011 WL 1576691 (D. Del. Apr. 26, 2011) .....................................................................16, 17

ME1 40346544v.1

*Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*,
    844 F. Supp. 2d 519 (D. Del. 2012)............................................................16, 17

*MidCap Funding X Tr. v. Graebel Companies, Inc.*,
    2020 WL 2095899 (Del. Ch. Ct. Apr. 30, 2020) ...................................10, 11

*U.S. Ex Rel Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
    812 F.3d 294 (3d Cir. 2016)...........................................................................8

*Nami v. Fauver*,
    82 F.3d 63 (3rd Cir. 1996) .............................................................................7

*Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*,
    184 F.3d 623 (7th Cir. 1999) .........................................................................7

*Prairie Capital III, L.P. v. Double E Holding Corp.*,
    132 A.3d 35 (Del. Ch. Ct. Nov. 24, 2015) ................................................9, 10, 11

*Progressive Int'l Corp. v. E.I. Dupont de Nemours & Co.*,
    2002 WL 1558382 (Del. Ch. Ct. Jul. 9, 2002) .........................................11

*State Farm Mut. Auto. Ins. Co. v. Ficchi*,
    2012 WL 1578247 (E.D. Pa. May 4, 2012) ...............................................7, 8

**Rules**

FRCP 8(a) ...............................................................................................................7, 8

FRCP 9(b) ...................................................................................................7, 8, 16, 18

FRCP 12(b)(6) ........................................................................................................1, 7

ME1 40346544v.1

## I.       INTRODUCTION

Defendant Anitian, Inc.'s ("Anitian's") partial motion to dismiss Count Two of the First Amended Complaint ("FAC") under Federal Rule of Civil Procedure ("FRCP" or "Rule") 12(b)(6) must fail.  Count Two of Plaintiff UberEther, Inc.'s ("UberEther's") First Amended Complaint is a claim of fraud in the inducement.  Anitian argues that such a claim is barred by the language of the relevant agreement between the parties and that UberEther failed to sufficiently allege fraud in the inducement.  Neither argument has merit.  The agreement between UberEther and Anitian contains no language precluding UberEther's reliance on the many false representations that Anitian made to induce UberEther into the agreement.  Moreover, UberEther sufficiently pleads a fraud in the inducement claim with allegations that describe (1) the various false misrepresentations made by Anitian executives and personnel, (2) Anitian's apparent knowledge thereof and intent to use such misrepresentations to induce UberEther into an agreement, and (3) UberEther's justifiable reliance on Anitian's false misrepresentations in deciding to enter the agreement.  Accordingly, UberEther respectfully requests that this Court deny Anitian's partial motion to dismiss.

## II.      NATURE AND STAGE OF THE PROCEEDINGS

On January 21, 2021, UberEther filed this case against Anitian for breach of contract (Count One) and fraud in the inducement (Count Two).  D.I. 1 (the "Original Complaint").  On February 14, 2022 Anitian filed a partial motion to dismiss Count Two and a motion for a more definite statement.  D.I. 8; D.I. 9.  In response thereto, on March 16, 2022, UberEther filed the First Amended Complaint.  D.I. 11 (sealed); D.I. 12 (public).  Thereafter, on April 1, 2022, Anitian filed another partial motion to dismiss Count Two of the First Amended Complaint under FRCP 12(b)(6).  D.I. 13; D.I. 14.

1

### III.    SUMMARY OF THE ARGUMENT

1.    The Master Services Agreement ("MSA") does not contain language that constitutes an anti-reliance clause so as to bar UberEther's reliance on Anitian's extra-contractual fraudulent statements in support of its fraud in the inducement claim.

2.    UberEther sufficiently pleads a claim for fraud in the inducement by alleging (a) the false representations that were made by Anitian, (b) that Anitian had the state of mind required for a fraud claim, and (c) that UberEther justifiably relied on Anitian's false misrepresentations.

### IV.    STATEMENT OF FACTS

####    A.    BASIS OF UBERETHER AND ANITIAN'S RELATIONSHIP

UberEther created the UberEther Cloud Managed Service, a cloud service offering known as "IAM Advantage."  FAC ¶ 7.  IAM Advantage is a cybersecurity tool intended to assist the Department of Defense ("DOD") and other federal government agencies address and alleviate their user identity and access management concerns.  FAC ¶ 8.  The DOD and other governmental entities expressed interest in acquiring IAM Advantage for that purpose. However, before the federal government is able to purchase the technology, UberEther is required to complete and pass a robust assessment performed by a third-party assessment organization ("3PAO") so that it can receive an authority to operate by the federal government or specific purchasing agency.  FAC ¶¶ 9–10.

This required authority includes the Federal Risk and Authorization Management Program ("FedRAMP"), a government-wide program that provides a standardized approach to security assessment, authorization, and continuous monitoring for the adoption of secure cloud services. FAC ¶ 11.  FedRAMP is mandatory for executive agency cloud deployments and service models at Low, Moderate, and High risk impact levels or "baselines."  FAC ¶ 12.  A key requirement of a

ME1 40346544v.1

FedRAMP authorization is to have the offering cloud service provider assessed by an independent 3PAO.  FAC ¶ 13.

Above and beyond the FedRAMP High or Moderate baselines lies the DOD cloud security requirements that are explained and codified in the Defense Information Systems Agency's Cloud Computing Security Requirements Guide ("DOD CC SRG").  FAC ¶ 16.  The DOD CC SRG provides a standardized assessment and authorization process for cloud service providers to gain a DOD provisional authorization, so that they can serve DOD customers, and meet clearly defined security control baselines defined for DOD Impact Levels ("IL") 2, 4, 5, and 6.  FAC ¶¶ 17–19.  Specifically, DOD CC SRG IL5 allows cloud service providers to host unclassified National Security Systems supporting DOD missions and, accordingly, calls for more stringent control parameter requirements than required of existing FedRAMP Moderate and High impact levels.  FAC ¶ 20a.–d.  Therefore, to obtain authorization to operate for the DOD CC SRG IL5 environment, a cloud service offering must  be assessed by a FedRAMP approved 3PAO and the Defense Information Systems Agency ("DISA") Cloud Security Control Assessor ("SCA"), then validated against both the FedRAMP High baseline and the additional DOD CC SRG IL5 Requirements.  FAC ¶ 21.  The cloud service provider and 3PAO must submit assessment documentation for DISA Cloud SCA review and validation; a cloud service provider cannot move forward if it fails its Readiness Assessment Report.  FAC ¶¶ 23–24.

### B.    INITIAL INDUCEMENT

UberEther began its interactions with Anitian in November 2019 when it met with Katherine Burgess for an initial presentation in relation to using Anitian to make it FedRAMP audit-ready.  FAC ¶ 37.  From that point on, Anitian began to make fraudulent representations as to its capabilities in order to induce UberEther to contract with it, promising a path to becoming FedRAMP audit-ready.  Specifically, prior to the execution of any agreement, Anitian made

3

multiple representations, assurances, and promises to UberEther that Anitian knew were false, including that:

1. Anitian would provide UberEther existing locked down versions of the components Anitian has deployed with previous customers for use in UberEther's environment;

2. Anitian would share their existing templates and scripts to deploy all the necessary agents and be reused within UberEther's platform;

3. Anitian would be able to help UberEther get all the scripts automated as part of the services;

4. Anitian possessed a repository library with modules configured and images already hardened and ready to use;

5. Anitian had operating system images with the modules already configured and hardened so UberEther can get its components migrated as part of the service;

6. Anitian had in its repository the reference architectures for any items in Amazon Web Services relevant to and generally suited for UberEther's efforts;

7. Anitian would provide UberEther numerous scripts for automation capable of helping UberEther through the deployment of services without extra invoices; and

8. Anitian hosted a set of scripts in GitHub that UberEther could use.

*See* FAC ¶¶ 37–49.

These representations were false. Anitian did not have multiple customers that either (1) started with FedRAMP Moderate and then started IL-4 or IL-5 immediately post-audit; (2) started IL-5 immediately (FAC ¶¶ 40–41); or (3) had already passed a FedRAMP High audit with the help of Anitian (FAC ¶¶ 32–35). Anitian did not have scripts, automation, or templates that it could provide to UberEther. FAC ¶ 46. The repository library, reference architectures, and hardened images Anitian referenced did not exist. *Id.* UberEther later discovered it would be required to purchase images from another vendor. *Id.* Anitian did not have a sufficient basis of materials that could be modified to meet UberEther's needs. *Id.* Anitian did not host a set of scripts in Github that UberEther could access. FAC ¶ 48.

4

### C.      EXECUTION OF THE AGREEMENTS AND FURTHER INDUCEMENT

In reliance on Anitian's false representations outlined above, UberEther entered into the MSA and Moderate Proposal with Anitian on March 31, 2021.  FAC ¶ 50.  Among other things, the MSA provides that Anitian "possesses the required skills to provide and perform the Services in accordance with this Agreement and the Proposal," and that those services would be "performed for and delivered to [UberEther] in strict conformance with the Proposal, in a diligent, workmanlike manner and in accordance with industry standards, laws and governmental regulations …."  MSA § 2.5.  The MSA also provides that "NOTHING IN THIS AGREEMENT SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY FOR GROSS NEGLIGENCE, *FRAUD* OR INTENTIONAL MISCONDUCT OF SUCH PARTY OR ITS EMPLOYEES OR AGENTS OR FOR DEATH OR PERSONAL INJURY."  MSA § 2.12 (emphasis added).

Quickly after execution of the MSA, however, Anitian's statements started becoming inconsistent with its previous promises and assurances, and UberEther felt it necessary to point out these discrepancies to Anitian.  FAC ¶¶ 89; 91–94.  Once again, Anitian then employed fraudulent representations to induce UberEther to not only remain contracted with Anitian, but expand the scope (and cost) of the services UberEther was seeking.   Specifically, Anitian falsely and repeatedly:

1.  provided UberEther assurances and a plan forward to address revising the offered services to obtain an application environment that was audit-ready to meet the FedRAMP High baseline;

2.  assured UberEther that it had multiple customers pursuing FedRAMP High and/or DOD CC SRG certifications, and that it had experience pursuing those certifications;

3.  outlined the changes and adjustments that Anitian could/would incorporate into its services to meet UberEther's needs;

4. represented that Anitian could support UberEther whether it planned to have all of its DOD customers on one FedRAMP High IL5 platform or have a separate FedRAMP High IL5 platform for each DOD customer;

5. represented that Anitian could set up a control plane that UberEther could use for all necessary environments, in which Anitian would use the same tooling and deploy the same stack for UberEther's use;

6. represented that Anitian would make a "couple of architectural changes," which would set UberEther up on a FedRAMP High path;

7. represented to UberEther that Anitian would change to a different build and "pivot on a couple of things" to meet UberEther's needs and assured UberEther that such changes would not "hurt" UberEther's FedRAMP Moderate authorization.

8. assured UberEther that pivoting to address UberEther's FedRAMP High needs at that time would be better for UberEther as a company;

9. advised UberEther that Anitian had a minimum viable AWS build for FedRAMP High that could be updated for UberEther's DOD CC SRG IL5 purposes;

10. assured UberEther that Anitian would evaluate what it could do to move forward and the necessary division of effort on its part that would be required to meet UberEther's needs;

11. represented that Anitian would provide UberEther with one or two qualified cloud engineers to take a template and customize it for UberEther's needs and integrate it with Anitian's platform in only four (4) weeks, resulting in a reusable template that worked with Anitian's platform for UberEther's customer environments;

12. represented that UberEther could own the infrastructure template moving forward; and

13. represented that AWS provided Anitian the contact information of a resource who purportedly built the DOD framework for Anitian to call upon as needed to meet the DOD CC SRG IL5 requirements.

*See* FAC ¶¶ 64–71.  Notably, Anitian's Founder and CTO, Andrew Plato, admitted that what other Anitian executives had represented to UberEther before executing the MSA was false and exaggerated, that Anitian did not have the resources it previously claimed that it did, and that Anitian had "wronged," but was "going to right it.  It's not going to be easy and it's going to be messy and [Anitian is] going to probably lose money."  FAC ¶ 65.

6

Relying on these new representations (which UberEther later learned were also false), the parties signed the High Proposal as an addition to the Moderate Proposal and an addendum to the MSA.  FAC ¶ 72.  The High Proposal was intended to memorialize Anitian's intent to make UberEther's service application an "Audit-Ready FedRAMP High with DOD SRG IL5 environment."  FAC ¶ 75.  In breach of the MSA, Moderate Proposal, and High Proposal, Anitian never provided the promised results and could not because it did not have the capabilities, experience, and materials it repeatedly represented possessing.

## V.   LEGAL STANDARD

Determining whether a complaint states a claim generally is accomplished under FRCP 8(a) and 12(b)(6).  In considering the sufficiency of a complaint, "courts must determine whether the complaint as a whole contains sufficient factual matter to state a facially plausible claim." *Argueta v. U.S. Immigration and Customs Enforcement*, 643 F.3d 60, 74 (3d Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom" and view them in the light most favorable to the non-moving party. *Nami v. Fauver*, 82 F.3d 63, 65 (3rd Cir. 1996); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *State Farm Mut. Auto. Ins. Co. v. Ficchi*, 2012 WL 1578247, at *4 (E.D. Pa. May 4, 2012).  A claim is sufficiently pled if it is facially plausible, which occurs when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Twombly* 550 U.S. at 570.

When pleading fraud, Rule 9(b) requires pleading with particularity. The purpose is to provide the defendant notice and ensures that such claims are "responsible and supported, rather than defamatory and extortionate." *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir. 1999).  The standard is met when a plaintiff provides "the who, what, when,

where and how" of the alleged fraudulent scheme.  *U.S. Ex Rel Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016).  A plaintiff must usually provide the "date, time, or place" of the alleged fraud, along with information on who made the misrepresentation to whom and the "general content of the misrepresentation" or use "some [other] means of injecting precision and some measure of substantiation into their allegations of fraud." *Ficchi*, at *5 (alteration in original) (citing numerous Third Circuit opinions in support).  However, that rule is to be applied with some flexibility especially when key factual information is in the defendants' control.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).  While fraud must be pled with particularity, malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.  Fed. R. Civ. P. 9(b).  The normal pleading standards under Rule 8 and *Twombly* and *Iqbal* apply to these allegations.  *Ficchi*, at *6.

## VI.   ARGUMENT

### A.   THE MSA DOES NOT BAR UBERETHER'S RELIANCE ON ANITAN'S FRAUDULENT STATEMENTS

Anitian argues that the MSA contains anti-reliance language that precludes UberEther from relying on Anitian's fraudulent extra-contractual statements.  *See* D.I. 14, Anitian's Opening Brief in Support of its Partial Motion to Dismiss Plaintiff UberEther's First Amended Complaint ("Anitian's Opening Br.") at 11–15.  Based on the applicable Delaware law[1] and the relevant provisions of the MSA,[2] this argument fails.

---

[1] UberEther does not dispute that Delaware law governs.  *See* Anitian's Opening Br. at 10, n.3 (citing MSA § 2.19).

[2] UberEther does not dispute Anitian's assertion that consideration of the MSA should not convert its motion to dismiss into a motion for summary judgment.  *See* Anitian's Opening Br. at 1, n.1.

It is true that Delaware law "enforces bilaterally negotiated agreements on their terms as a matter of fundamental public policy" that "promotes commercial consistency and predictable legal outcomes." *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *12 (Del. Super. Ct. July 29, 2021) (internal quotations and citations omitted). That policy yields, however, to overriding policy concerns such as Delaware's policy against fraud. *Id.* Thus, "contractual freedom ends where attempts to 'immunize' contractual fraud begins." *Id.* (citing *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1061 (Del. Ch. Ct. Feb. 14, 2006)).

To balance these policies, Delaware permits "sophisticated parties contractually to shift the risks posed by post-closing fraud claims." *Id.* at *13. One way this may be done is with an anti-reliance provision "that cabins the universe of information on which an aggrieved party may ground a fraud claim." *Id.* (internal quotation omitted). Anti-reliance provisions therefore free sophisticated counterparties to "limit the possibility of future claims of fraud or misrepresentation by contractually specifying what representations the parties are and are not making and relying upon." *Infomedia Grp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *4 (Del. Super. Ct. July 31, 2020).

While Delaware law therefore permits reliance on extra-contractual statements to be disclaimed, the parties' intent to preclude such reliance "***must*** emerge ***clearly and unambiguously*** from the contract." *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. Ct. May 19, 2004) (emphasis added). Delaware law does not require an agreement to have "magic words" to invoke anti-reliance, *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 51 (Del. Ch. Ct. Nov. 24, 2015), but "murky integration clauses, or standard integration clauses without explicit anti-reliance representations, <u>will not</u> relieve a party of its oral and extra-contractual fraudulent representations." *Abry*, 891 A.2d at 1059 (emphasis added); *see also id.* ("[W]e have not given

9

effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements."). Rather, agreements "must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Kronenberg*, 872 A.2d at 593. "This approach achieves a sensible balance between fairness and equity—parties can protect themselves against unfounded fraud claims through ***explicit*** anti-reliance language. ***If parties fail to include unambiguous anti-reliance language, they will not be able to escape responsibility for their own fraudulent representations made outside of the agreement's four corners.***" *Abry*, 891 A.2d at 1059 (emphasis added).

Anitian relies on two cases, *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35 (Del. Ch. Ct. Nov. 24, 2015) and *MidCap Funding X Tr. v. Graebel Companies, Inc.*, 2020 WL 2095899 (Del. Ch. Ct. Apr. 30, 2020), to support its argument that the MSA contains anti-reliance provisions. Neither of those cases are helpful to Anitian. While the Delaware Court of Chancery may have found that the agreements in each of *those* cases contained language that added up to clear anti-reliance clauses, such language is not found in *this* case or *this* contract, and there is a sharp contrast between those decisions and these facts.

First, in *Prairie*, the agreement at issue explicitly addressed reliance. 132 A.3d at 50. The agreement provided that

> [i]n making its determination to proceed with the Transaction, the ***Buyer has relied on (a) the results of its own independent investigation and (b) the representations and warranties of the Double E Parties expressly and specifically set forth in this Agreement, including the Schedules. SUCH REPRESENTATIONS AND WARRANTIES BY THE DOUBLE E PARTIES CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE DOUBLE E PARTIES TO THE BUYER IN CONNECTION WITH THE TRANSACTION, AND THE BUYER UNDERSTANDS, ACKNOWLEDGES,***

10

> ***AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OR PROSPECTS OF DOUBLE E AND THE SUBSIDIARIES) ARE SPECIFICALLY DISCLAIMED BY THE DOUBLE E PARTIES.***

*Id.* (bold and italic emphasis added).  The agreement also included a standard integration clause. *Id.*

In *MidCap Funding*, the agreement also explicitly addressed reliance.  2020 WL 2095899, at *19–20.  The agreement provided that

> [e]ach and every one of the parties hereto expressly agrees and acknowledges that it has been represented by counsel in connection with the negotiation and execution of this Agreement. Each and every one of the parties hereto further expressly agrees and acknowledges that *it is not entering into this Agreement in reliance upon any representations, promises or assurance other than those expressly set forth in this Agreement*.

*Id.* at *19 (emphasis in original).  That agreement, too, contained a standard integration clause.  *Id.* at *20.

Other cases in which Delaware courts have found effective anti-reliance language also include the requisite explicit references to reliance.  *See Aveanna*, 2021 WL 3235739, at *14 (finding effective anti-reliance where the agreement's provisions narrowed "the scope of permissible reliance to the representations made" within the agreement, expressly affirmed reliance on statements made outside the agreement were precluded, included an integration clause, and permitted fraud claims based on contractual representations); *Progressive Int'l Corp. v. E.I. Dupont de Nemours & Co.*, 2002 WL 1558382, at *5 (Del. Ch. Ct. Jul. 9, 2002) (finding effective anti-reliance language where the agreement's integration clause stated "This LICENSE ... constitutes the entire agreement between the Parties ... and supercedes [sic] all prior and contemporaneous agreements, representations, and understandings ... [and] ***[e]ach of the Parties***

***acknowledges that no other party, nor any agent or attorney of any other party, has made any promise, representation, or warranty whatsoever ... and acknowledges that the Party has not executed or authorized the execution of this instrument in reliance upon any such promise, representation, or warranty not contained herein.***") (emphasis added).

Here, in contrast, Anitian points to two provisions of the MSA that it claims can be cobbled together to create a clear anti-reliance clause.  First, Anitian cites the MSA's integration clause, which provides that the MSA "constitutes the entire agreement and understanding of the parties as to the subject matter hereof and merges and supersedes all prior representations, proposals, discussions, and communications whether oral or in writing."  Opening Br. at 13 (quoting MSA § 2.21).  There is no mention of reliance in this provision.

Second, Anitian cites Section 2.5 of the MSA, which Anitian claims "memorializes affirmative representations that Anitian 'possesses the required skills to provide and perform' the services contracted for, and then specifically disclaims all warranties not included in that section[.]"  Opening Br. at 13–14 (citing MSA § 2.5).  Anitian also argues that in Section 2.5, UberEther "'acknowledge[d] that it is not always feasible for Anitian … to possess complete knowledge of all possible implementations of a particular third-party application(s) and that of [UberEther's] application(s)" and "agree[d] that the foregoing represents [UberEther's] sole and exclusive remedy for any failure of the Services and/or Deliverables to meet the limited warranty provided in this Section ...."  Opening Br. at 14 (quoting MSA § 2.5).  In Anitian's view, Section 2.5 therefore "expressly cabined" its representations and warranties.  Opening Br. at 14.

There are two problems with Anitian's argument.  First, Section 2.5 is silent on "representations," as opposed to "warranties" and therefore does not undo its prior representations. The language of Sections 2.21 and 2.5 is far from making up a clear anti-reliance clause and does

12

nothing to eliminate the specter of fraud that haunts Anitian's actions.  At the outset, neither Section—nor *any* Section of the MSA—make *any* mention of "reliance," much less an explicit statement of what the parties relied upon in executing the MSA, and thus fail to create an anti-reliance clause.  *See, e.g.*, *Anvil*, 2013 WL 2249655, at *8 (finding an agreement's two provisions, one of which provided that "neither the Company nor any Seller 'makes any other express or implied representation or warranty with respect to the Company … or any Seller or the transactions contemplated by this Agreement," were ***not*** sufficiently specific to foreclose reliance on extra-contractual representations).  The MSA here is even less helpful to Anitian than *Anvil*, where the Delaware Court of Chancery found the provisions *insufficient* to invoke an anti-reliance provision bar against extra-contractual statements similar to those relied upon by Anitian, because the provision in *Anvil* addresses "representations" in addition to warranties, while the MSA is silent on "representations."  At best, Anitian points to "murky" clauses that fail to unambiguously preclude reliance on extra-contractual statements.  *See Kronenberg*, 872 A.2d at 593 (finding murky integration clauses insufficient for anti-reliance purposes).  Thus, the MSA's inclusion of a murky and, at most, standard integration clause cannot salvage the fact that the MSA does not contain an anti-reliance provision.

Second, while Anitian attempts to disclaim other warranties in Section 2.5, UberEther <u>does not</u> explicitly or unambiguously disclaim reliance on Anitian's prior representations.  *See Heritage Handoff Holdings, LLC v. Fontanella*, 2019 WL 1056270, at *4 (D. Del. Mar. 6, 2019) ("[A]n enforceable anti-reliance provision must contain a promise by the plaintiff that it did not rely on extra-contractual statements. . . . The [agreement] does not contain unambiguous anti-reliance language. Though Defendant disclaimed extra-contractual representations, Plaintiff did not affirmatively promise not to rely on such representations."); *Anschutz Corp. v. Brown Robin*

*Capital, LLC*, 2020 WL 3096744, at \*14 (Del. Ch. Ct. June 11, 2020) (explaining that where a "contract does not actually include a specific acknowledgement by a party that it is only relying on information contained within the four corners of the agreement, that party is not shirking its bargain when it later alleges that it did, in fact, rely on extra-contractual representations"); *Anvil Holding Corp. v. Iron Acquisition Co., Inc.*, 2013 WL 2249655, at \*8 (Del. Ch. Ct. May 17, 2013) (permitting plaintiff's fraud claim because the agreement did not "reflect a clear promise **by the Buyer** that it was not relying on statements made to it outside of the Agreement to make its decision to enter into the Agreement," and did "not state that the parties *disclaim reliance* upon extra-contractual statements") (bold emphasis added) (italic emphasis in original); *Kronenberg*, 872 A.2d at 593 (standard integration clauses must contain "explicit anti-reliance representations" and be "accompanied by other contractual provisions demonstrating with clarity that **the plaintiff had agreed that it was not relying on facts outside the contract**") (emphasis added).

Moreover, Section 2.5 is not nearly as all-encompassing as Anitian wishes. First, the fact that Section 2.5 provides that "it is not always feasible for Anitian … to possess complete knowledge of all possible implementations of a particular third-party application(s) and that of [UberEther's] application(s)" does *not* indicate that UberEther recognized or anticipated "limits inherent" in Anitian's representations and warranties as Anitian suggests. If anything, Section 2.5 reinforces UberEther's understanding that Anitian would be able to fulfill *__its__* promises. *See* MSA § 2.5 ("[UberEther] agrees to reasonably explain the unique designs, usage, and configurations of any relevant technology or methodology used in Subscriber's business if and as requested by Anitian in writing ***to ensure that Anitian and its agents are able to properly fulfill the terms outlined in a Proposal.***") (emphasis added). Section 2.5 is therefore no safe harbor for Anitian and a far cry from the clear and unambiguous language required to invoke an anti-reliance clause.

Second, while Section 2.5 provides "that the foregoing represents [UberEther's] sole and exclusive remedy for any failure of the Services and/or Deliverables to meet the limited warranty provided in this Section," Anitian fails to read the MSA as a whole, as it must.  Anitian completely ignores Section 2.12, which provides that "NOTHING IN THIS AGREEMENT SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY FOR GROSS NEGLIGENCE, *FRAUD* OR INTENTIONAL MISCONDUCT OF SUCH PARTY OR ITS EMPLOYEES OR AGENTS OR FOR DEATH OR PERSONAL INJURY."  MSA § 2.12 (emphasis added).  Therefore, regardless of any language in Section 2.5, the MSA specifically and expressly contemplates the viability of fraud claims and contains no language otherwise limiting that viability.  *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 141 (Del. Ch. Ct. Nov. 23, 2009) ("[The agreement's exclusive remedy] provision preserves the parties' right to purse [sic] 'claims involving fraud or intentional misrepresentation.' … It does not contain language that would limit the right to claims 'involving fraud or misrepresentation based on the contractual representations in the agreement.' When drafters specifically preserve the right to assert fraud claims, they must say so if they intend to limit that right to claims based on written representations in the contract. I will not imply that limitation.").

Accordingly, the MSA does not preclude UberEther from relying on Anitian's fraudulent extra-contractual representations that were made to induce UberEther into the MSA, the Moderate Proposal and, later, the High Proposal.  *See* FAC ¶¶ 37–49; 64–71.  The allegations of the First Amended Complaint therefore sufficiently plead UberEther's justifiable reliance on Anitian's false representations and Count Two ("Fraud in the Inducement") should not be dismissed.

Moreover, even if the MSA *did* contain any so-called anti-reliance provision, Count Two would survive Anitian's partial motion to dismiss for a separate, independent reason: UberEther's

allegations of contractual fraud.  Section 2.5 explicitly provides that "(a) [Anitian] and each of its employees, consultants and subcontractors performing Services possesses the required skills to provide and perform the Services in accordance with this Agreement and the Proposal; and (b) the Services will be performed for and delivered to UberEther in strict conformance with the Proposal, in a diligent, workmanlike manner . . . ."  The First Amended Complaint alleges that Anitian's representation in subclause (a) of Section 2.5 was false, as "Anitian and its agents both lacked the required skills to furnish the Services in accordance with the Agreement and/or the Proposal." FAC ¶ 58.  *See also* FAC ¶¶ 1, 186, 188, 191, and 192.  These allegations easily plead a *contractual* fraud claim, and thus, Count Two survives regardless of any alleged anti-reliance clause that would bar UberEther's reliance on Anitian's extra-contractual fraudulent misrepresentations.

## B.     UBERETHER SUFFICIENTLY PLEADS A CLAIM FOR FRAUD

Anitian also argues that Count Two should be dismissed insofar as the allegations fail to sufficiently plead contractual fraud.  Opening Br. at 15.  Anitian's arguments all fail—the First Amended Complaint alleges a claim of fraud based upon Anitian's contractual misrepresentations (*see* discussion *supra*, pp. 15–16) and Anitian's extra-contractual misrepresentations, which differs distinctly from UberEther's breach of contract claim.

### 1.     UberEther has sufficiently pled Anitian's knowledge of falsity and fraudulent intent.

As Anitian states, "[s]cienter is an essential element in pleading fraud."  Opening Br. at 16 (citing *Kuhn Constr. Co. v. Diamond State Port Corp.*, 2011 WL 1576691, at *9 (D. Del. Apr. 26, 2011) ("*Kuhn I*")).  Anitian argues that boiler plate, conclusory allegations are insufficient under Rule 9(b) and cites to *Kuhn I* and *Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 530 (D. Del. 2012) ("*Kuhn II*") for that point.  Anitian, however, ignores the full context, language, and analysis of both cases.

16

Specifically, in *Kuhn I*, the Court considered a complaint in which it found the plaintiff (1) "failed to allege that defendant knew or believed that the information that was provided was either false or purposefully misleading;" and (2) did not identify "the content of the alleged misrepresentations or how the claimed representations were false." 2011 WL 1576691, at *9. The Court also found plaintiff's "failure to allege circumstances indicating conscious or reckless behaviour by the defendant, or facts showing a motive or clear opportunity for committing fraud cause[d] plaintiff's claim to fail as a matter of law." *Id.* *Kuhn II* contains a similar analysis, finding the plaintiff failed to allege any motivation for the defendant's knowingly false representations. 844 F. Supp. 2d at 530.

In contrast to the *Kuhn* decisions, Anitian itself points to the allegations in the First Amended Complaint where UberEther: (1) alleged that Anitian knew or believed its representations to be false (*see* Opening Br. at 17 (citing FAC ¶¶ 49, 92, 187, and 191 where UberEther alleged Anitian's knowledge of its false representations)); (2) identified the content of Anitian's misrepresentations (*see* Opening Br. at 18 (citing FAC ¶¶ 41, 46, 48, 58, 67, and 70 where UberEther alleged specific misrepresentations by Anitian representatives)); and (3) alleged circumstances indicating Anitian's conscious or reckless behavior and facts showing a motive and opportunity (*see* Opening Br. at 19 (citing FAC ¶¶ 45, 46, 48, and 67 where UberEther alleged the circumstances that demonstrate the falsity of Anitian's representations and the resulting failures because of those misrepresentations)); *see also* FAC ¶¶ 70, 72, and 191 (alleging that Anitian's misrepresentations were made to induce UberEther to enter into, and remain a party to, the relevant contracts). Thus, while intended to justify its motion to dismiss, Anitian's arguments simply serve to demonstrate the viability of UberEther's properly and sufficiently pled fraud claim.

To be sure, UberEther's allegations are entitled to be credited at this stage, particularly considering that Rule 9(b) allows for state of mind to be averred generally and that courts afford plaintiffs flexibility when key factual information is in a defendant's control. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). This flexibility includes a plaintiff's ability to plead based upon information and belief. *See Brinkmeier v. BIC Corp.*, 733 F. Supp. 2d 552, 559 (D. Del. 2010), *adhered to on denial of reconsideration,* 2011 WL 2446427 (D. Del. June 16, 2011) ("[C]ourts have recognized that a relaxed Rule 9(b) standard may apply when essential information lies uniquely within another party's control. Thus, in such situations, a plaintiff may plead based upon information and belief, but only if the pleading sets forth the specific facts upon which the belief is reasonably based.") (internal citations and quotations omitted).

UberEther has pled the state of mind element of its fraud in the inducement claim by both generally averring (FAC ¶¶ 49, 72, 92, 187, 191) and pleading upon information and belief (FAC ¶¶ 41, 46, 48, 58, 67, 70). UberEther also alleges various facts, including admissions from Anitian key personnel and leadership, that set forth a reasonable basis for UberEther's belief that the misrepresentations were made to induce it into choosing to contract with Anitian to make it FedRAMP audit-ready over any of Anitian's competitors. *See generally* FAC "Inducement into and Execution of the Agreements," ¶¶ 36–85. Accordingly, the allegations contained in the First Amended Complaint sufficiently plead Anitian's knowledge of its false representations and its fraudulent intent to the extent required of a pleading under Rule 9(b).

## 2. UberEther's allegations do not contradict its justifiable reliance on Anitian's false representations.

The allegations in the First Amended Complaint support UberEther's justifiable reliance on Anitian's false representations. They do not contradict such or "underscore" any "implausibility of UberEther's position."

First, as described *supra* (pp. 13–14), the MSA did not contemplate or anticipate limits inherent in Anitian's representations.  Rather, if anything, the MSA anticipated that there may be certain circumstances where Anitian would need some clarification by UberEther "to ensure that Anitian and its agents are able to properly fulfil the terms outlined in a Proposal."  MSA § 2.5 This evidences the parties' intent to incorporate an emphasis into the MSA on making sure that the desired goal of the contract was achieved—not any limitation on Anitian's represented abilities.

Second, the fact that UberEther needed to provide Anitian with training, documents, and maintenance in order for Anitian to perform the agreed-upon tasks means nothing in regard to UberEther's knowledge of Anitian's misrepresentations.  Anitian falsely represented its abilities, experience, and available resources, which are all things that UberEther would consider—and in fact, did consider—when determining whether to pay, trust, and contract with Anitian to get it ready to sell to the federal government and the DOD.  What UberEther later provided to Anitian to aid Anitian in its course correction has no relevance to what UberEther would have known about Anitian and relied on for purposes of being induced into the MSA and High Proposal.

Finally, the First Amended Complaint makes clear that UberEther entered into the High Proposal with Anitian due to a new round of false representations (compounded by the prior misrepresentations).  From UberEther's perspective, and as alleged in the First Amended Complaint, Anitian representatives, particularly Andrew Plato, admitted to other Anitian executives' previous misrepresentations, promised that changes could be made to fix the issues, and assured UberEther that it had customers for which it had completed the same type of services in the past.  FAC ¶¶ 64–71.  Such allegations demonstrate that Anitian "doubled-down" on its false representations rather than undermine UberEther's justifiable reliance.

ME1 40346544v.1

### 3. UberEther alleges that Anitian falsely represented its experience, resources, and skills.

Anitian also appears to argue that certain allegedly false representations pleaded in the First Amended Complaint constitute "puffery," which cannot support UberEther's fraud claim. Anitian does not address the sufficiency and actionable quality of all of UberEther's allegations, and instead cherry picks some that it claims are "enthusiastic sales puffery," "marketing statements," or "presentations concerning Anitian's capabilities generally[.]" Opening Br. at 23.

Nevertheless, the First Amended Complaint contains many allegations addressing Anitian's false representations *of fact* as to its resources, experience, and skill. For example, UberEther alleges that Anitian made several false representations that it already had multiple customers that it had helped to fulfil the same needs as UberEther. *See* FAC ¶¶ 40–41, 64. Anitian, in fact, did not have multiple customers for which it had achieved UberEther's goals. FAC ¶ 41. UberEther also alleged that Anitian falsely represented that it possessed scripts, automation, templates, hardened images, a repository library, and reference architectures that UberEther could use. *See* FAC ¶¶ 45–48, 89–90. Again, Anitian did not have those materials. FAC ¶¶ 46, 48, 90.

These allegations, regardless of any "optimistic statements" that the First Amended Complaint also alleges, sufficiently plead that Anitian made false representations as to the resources, experience, and skills that it claimed to possess at the time it induced UberEther into the execution of the MSA and the High Proposal—not what may happen in the future. Accordingly, Count Two should not be dismissed.

## VII. CONCLUSION

For the foregoing reasons, the Court should deny Anitian's partial motion to dismiss Count Two of the First Amended Complaint.

20

Dated: April 25, 2022

**MCCARTER & ENGLISH, LLP**

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
Chelsea A. Botsch (#6715)
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
cbotsch@mccarter.com

*Attorneys for Plaintiff UberEther, Inc.*

21